AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.     2:21-mj-03361-DUTY |
| 44924 Laszlo St., Lancaster, California | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1344, 1349 | Wire Fraud, Bank Fraud, and Conspiracy |
| 18 U.S.C. § 1956 | Money Laundering |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition or a Firearm |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/
*Applicant's signature*

Alfredo Rossi, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  7/19/21

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Keith D. Ellison (213-894-6920)

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises to be searched is located at 44924 Laszlo St., Lancaster, California ("SUBJECT PREMISES 1").  SUBJECT PREMISES 1 is on the east side of Laszlo St., between Linda Ave. and Louise Ave., in Lancaster.  It is a gray colored, one-story, single-family residence of approximately 1,816 square feet with a brown tile roof.  The residence has an auburn and light-colored brick trim surrounding two support pillars leading to the front entrance of the residence and on the wall surrounding the garage door.  There is a concrete driveway on the left of the property leading to the garage.  The garage door is white in color and is draped by a black mesh screen that is affixed to the frame surrounding the garage door.  The numbers "44924" appear in black numbers on a white colored board located on the right side of the garage door directly underneath a white colored light fixture.  There is one large bay window facing the street on the right side of the front door and a smaller window on the left side facing the street.  The front door is white in color with an oval shaped glass feature in the center.  A gray colored metal security door is directly parallel and adjacent to the front door on the outside of the residence.  On the right side of the property, the rear yard is separated by a brown brick wall and contains a black metal access gate.

The area to be searched includes all rooms, annexes, attics, basements, porches, garages, carports, outside yard,

curtilage, mailboxes, trash containers, debris boxes, storage
lockers, locked containers and safes, cabinets, rooms, sheds,
and outbuildings associated with the premises and shall extend
into desks, cabinets, safes, briefcases, backpacks, wallets,
purses, trash receptacles, digital devices, and any other
storage locations within the premises.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Bank Fraud Conspiracy), 1956 (Money Laundering), and 922(g)(1) (Felon in Possession of Ammunition or a Firearm) (the "Subject Offenses"), namely:

a.   Any products, goods, or merchandise, including jewelry, purchased from Platinum Jewelry and Loan, 44617 Sierra Hwy in Lancaster, California ("Platinum Jewelry"), on or after January 1, 2021;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, reflecting or referencing purchases or transfers of jewelry, including pawn tickets, on or after January 1, 2021;

c.   U.S. currency in excess of $1,000, including the first $1,000 if more than $1,000 is recovered;

d.   Firearms and ammunition;

e.   Records, documents, programs, applications, or materials pertaining any bank accounts, credit card accounts, or other financial accounts belonging to or used by TYLER GREEN, RICHARD GREEN, and/or DAJAE GERMANY at domestic and foreign banks, savings and loans, credit unions, securities brokers, and other financial institutions, including applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

f.    Indicia of occupancy, residency or ownership of the SUBJECT PREMISES and other items described in the warrant, including forms of personal identification, utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

g.    Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

h.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

i.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices;

j.    Audio recordings, pictures, video recordings, or still captured images relating to the above-described offenses; and

k.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

l.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the attachment of other devices;

iii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

iv.  evidence of the times the device was used;

v.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vi.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

vii. records of or information about Internet Protocol addresses used by the device;

viii.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques.

   c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   g. The government may also retain a digital device if the government, prior to the end of the search period,

obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

        g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress TYLER GREEN's, RICHARD GREEN's, and DAJAE GERMANY's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of TYLER GREEN's, RICHARD GREEN's, and DAJAE GERMANY's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in

Graham v. Connor, 490 U.S. 386 (1989); specifically, law
enforcement may use no more than objectively reasonable force in
light of the facts and circumstances confronting them.

     8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

### AFFIDAVIT

I, Alfredo Rossi, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of criminal complaints and arrest warrants against TYLER MISHAEL GREEN ("TYLER GREEN"), RICHARD MAURICE GREEN ("RICHARD GREEN"), and DAJAE LIONEL GERMANY ("GERMANY") for violations of Title 18, United States Code, Section 1344(1) (Bank Fraud - Scheme to Defraud Bank).

2.     This affidavit is also made in support of an application for warrants to search the following:

a.     44924 Laszlo St., Lancaster, California ("SUBJECT PREMISES 1") as described more fully in Attachment A-1;

b.     43517 East Sahuayo St., Apartment 307, Lancaster, California 93535 ("SUBJECT PREMISES 2") as described more fully in Attachment A-2;

c.     5026 Cantlewood Dr., Palmdale, California ("SUBJECT PREMISES 3") as described more fully in Attachment A-3;

d.     11660 Church St., Apartment 600, Rancho Cucamonga, California ("SUBJECT PREMISES 4") as described more fully in Attachment A-4;

e.     The person of TYLER GREEN as described in Attachment A-5;

f.     The person of RICHARD GREEN as described in Attachment A-6; and

g.    The person of GERMANY as described in Attachment A-7.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Bank Fraud Conspiracy), 1956 (Money Laundering), and 922(g)(1) (Felon in Possession of Ammunition or a Firearm), (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>**BACKGROUND OF AFFIANT**</u>

5.    I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since June 2019.  I am currently assigned to the El Camino Real Financial Crimes Task Force group 2, where I investigate matters concerning bank fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.

6.    Prior to becoming a Special Agent with HSI, I was
employed as Special Agent with the United States Secret Service
("USSS") from June 2016 until June 2019, where I was responsible
for the investigation of various types of theft and fraud,
including the manufacturing of counterfeit and fraudulent
identification documents, and the investigation of financial
crimes (such as access device crimes, credit card fraud, check
fraud, and schemes to conceal and launder the proceeds of such
crimes).

7.    To become an HSI Special Agent, I completed 9 months
of training at the Federal Law Enforcement Training Center in
Brunswick, Georgia.  During my employment as an HSI and USSS
Special Agent, I have participated in several investigations
related to alien smuggling, narcotics smuggling, weapons
trafficking, organized criminal activity, child exploitation,
and financial crimes. I have participated in various aspects of
criminal investigations, including bank records analysis,
telephone records analysis, electronic surveillance, physical
surveillance, search warrants, arrests, and reviewing evidence
from digital devices.  I have also spoken to many law
enforcement agents regarding their experience in criminal
investigations, interviewed defendants, confidential informants,
and witnesses who had personal knowledge regarding the methods
used to commit various types of criminal offenses.

### III.  SUMMARY OF PROBABLE CAUSE

8.    TYLER GREEN, RICHARD GREEN, DAJAE GERMANY, and others
used debit and stored-value cards in their names to fraudulently

purchase approximately $18,072,894 worth of jewelry from
Platinum Jewelry and Loan in Lancaster, California, between
March 12 and May 18, 2021, despite having insufficient funds in
their associated accounts.  Each transaction was initially
declined when an incorrect PIN number was entered, but later
force-posted without authorization from the financial
institution issuing the card that was used.  In one instance, on
March 30, 2021, GERMANY fraudulently purchased a Cuban bracelet,
two Rolex bracelets, and four Rolex chains for $14,475.  In
another, on April 19, 2021, TYLER GREEN fraudulently purchased a
$219,000 ring.  And on April 27, 2021, RICHARD GREEN
fraudulently purchased a $42,000 bracelet.

        9.    TYLER GREEN resides at SUBJECT PREMISES 2.  RICHARD
GREEN resides at SUBJECT PREMISES 3.  And GERMANY resides at
SUBJECT PREMISES 4.  TYLER GREEN and RICHARD GREEN use SUBJECT
PREMISES 1 as their respective addresses of record to receive
financial records.  Evidence, fruits, and instrumentalities of
the Subject Offenses will be found at the SUBJECT PREMISES.

**IV.   <u>STATEMENT OF PROBABLE CAUSE</u>**

    **A.    Navy Federal Credit Union Reports Platinum Jewelry's
           Suspicious Transaction Activity**

        10.   On or about May 24, 2021, a Navy Federal Credit Union
("NFCU") investigator notified HSI that Platinum Jewelry and
Loan ("Platinum Jewelry"), a business located at 44617 Sierra
Hwy in Lancaster, California, had been implicated in a potential
fraud scheme involving TYLER GREEN.  According to NFCU
investigators, TYLER GREEN's NFCU debit card had been used in at

4

least 57 suspicious transactions at Platinum Jewelry between April 2021 and May 2021, for purchases totaling approximately $4,120,593.86.  At the time of the transactions, the checking account associated with TYLER GREEN's debit card had a negative balance.

11.  NFCU reported that all of the transactions were "chip present" transactions, meaning that the debit card was physically present and inserted into a point of sale at Platinum Jewelry when the transactions were attempted, and all were initially declined due to failed PIN entries.  After each transaction was declined, however, the transactions were subsequently force-posted without authorization from NFCU,[1] causing the checking account linked to the debit card to be overdrawn in the amount of $4,120,593.86 -- the entire amount of the relevant transactions.  NFCU was unable to reverse the charges and contacted VISA Inc. to submit a claim against Platinum Jewelry's merchant processor, Worldpay.

12.  TYLER GREEN's NFCU account statements indicate that the initial transactions identified by NFCU started on or about April 5, 2021, in amounts as low as $453, then increased throughout the month to as much as $200,000 per transaction. Each of the transactions identified by NFCU were posted to a

---

[1] A force-post transaction allows a merchant to bypass the standard payment authorization process by manually entering an authorization code.  The transaction is then routed through to the clearing and settlement function, and subsequently posted to the issuer.  In this way, a transaction can be executed and funds transferred without confirming that the account to be debited either contains sufficient funds (in the case of a debit card transaction) or has the appropriate available credit (in the case of a credit card transaction).

Comerica Bank ("Comerica") business checking account in the name
of Platinum Jewelry (the "Platinum Comerica Account"). On or
about April 29, 2021, there were six $200,000 transactions.

    **B.**    **TYLER GREEN Provided NFCU Investigators Conflicting**
              **Statements Regarding the Suspicious Transactions**

    13.  Based on my own investigation, my review of recordings
and records, and my conversations with NFCU investigators and
other law enforcement agents, I am aware of the following:

        a.  TYLER GREEN contacted NFCU on or about April 7,
2021, to inquire about a restriction of her Zelle[2] account.
After NFCU informed TYLER GREEN that her Zelle account was
restricted due to numerous failed PIN attempts using her debit
card, TYLER GREEN confirmed that she had possession of the debit
card and admitted completing the transactions associated with
the failed PIN attempts.

        b.  On or about April 9, 2021, TYLER GREEN called
NFCU from phone number 661-941-7808 (the "TYLER GREEN phone")
regarding a $20,000 debit from Platinum Jewelry.  During the
call, TYLER GREEN denied having any knowledge of Platinum
Jewelry, and denied ever having been to or conducting
transactions at Platinum Jewelry.  In a subsequent call later
that day, however, TYLER GREEN admitted conducting transactions
at Platinum Jewelry, but claimed those transactions were in
smaller amounts.  TYLER GREEN said she had last completed

---

    [2] Zelle is a digital payment network jointly owned by
various financial institutions which enables users to
electronically transfer money from their bank account to another
user's bank account using a mobile device.

transactions at Platinum Jewelry in or around November or December 2020.

c.   TYLER GREEN called NFCU on or about May 3, 2021, again using the TYLER GREEN phone, and acknowledged the overdrawn balance caused by the Platinum Jewelry debits.  TYLER GREEN said that her transactions at Platinum Jewelry were in the approximate amounts of $7,000.00 and $10,000.00, respectively. TYLER GREEN explained she planned to make a deposit into her NFCU account through a Moon Star Credit Union ATM, but was unable to locate her debit card.  When NFCU employees explained to TYLER GREEN that her account was overdrawn as a result of the Platinum Jewelry debits, TYLER GREEN did not dispute the debits, and instead requested a new debit card.

d.   TYLER GREEN called NFCU on or about May 15, 2021, to confirm receipt of a new debit card.  During the call, NFCU employees told TYLER GREEN about additional Platinum Jewelry transactions that had posted to TYLER GREEN'S NFCU account. NFCU employees advised TYLER GREEN to file a fraud claim with NFCU if the charges were fraudulent.  But NFCU has not received any such claims from TYLER GREEN.

e.   On or about May 17, 2021, an NFCU investigator attempted to contact TYLER GREEN several times via telephone but received TYLER GREEN's voicemail at every attempt.  As of June 10, 2021, TYLER GREEN has not returned any of NFCU's calls.

14.   On June 17, 2021, the Honorable Paul L. Abrams, United States Magistrate Judge, approved a warrant for the disclosure of historical cell-site information and prospective cell-site

information and GPS information for various cellular telephones, including the TYLER GREEN phone (661-941-7808) and GERMANY's phone (661-941-6311), discussed further below.  Based on my review of information obtained pursuant to that warrant, observations by law enforcement during periods of surveillance, and my investigation in this case, I believe that TYLER GREEN is the primary user of the TYLER GREEN phone.

**C.   NFCU Identifies Fraudulent Use of Another Debit Card at Platinum Jewelry**

15.   On or about May 31, 2021, an NFCU investigator told me that another debit card, issued by NFCU to GERMANY, had been fraudulently used at Platinum Jewelry between April 9, 2021, and not later than May 14, 2021.  NFCU identified at least 13 separate transactions, totaling approximately $70,681.04, all of which were force-posted transactions at the same Platinum Jewelry point of sale.

16.   GERMANY had called NFCU to activate the debit card from the same phone number used by TYLER GREEN, namely the TYLER GREEN phone.  GERMANY also called NFCU at least two additional times, on or about January 21, 2021 and April 20, 2021, from phone number 661-941-6311, the phone number associated with GERMANY's NFCU account.

17.   Based on my review of information obtained pursuant to the cell-site warrant described above, observations by law enforcement during periods of surveillance, and my investigation in this case, I believe that GERMANY is the primary user of phone number 661-941-6311.

D.   **Platinum Jewelry Processed more than $18 Million in Fraudulent Transactions**

18.  Based on my own investigation, my review of recordings and records, and my conversations with other law enforcement agents and with Comerica investigators, I am aware of the following:

a.   On or about June 9, 2021, a Comerica Bank investigator contacted HSI to report suspected fraudulent activity involving multiple force-posted debit transactions by one of Comerica's clients, Platinum Jewelry, associated with the client's account -- the Platinum Comerica account.  Comerica investigators reviewed activity records for the Platinum Comerica account and identified numerous deposits that appeared to be the result of suspicious force-posted transactions via Platinum Jewelry's point of sale terminal beginning on March 12, 2021, and continuing through May 18, 2021.  Comerica determined that the activity during this period was not consistent with the volume of transactions processed by Platinum Jewelry prior to March 2021.  Specifically, previous monthly deposit activity for the Platinum Comerica account averaged approximately $500,000, but the volume of transactions in the account spiked significantly in April 2021, reaching approximately $18,300,000, during the period of the suspicious force-posting activity.

b.   The authorization logs for the Platinum Comerica account document force-posted transactions involving at least 11 debit or stored-value cards issued by NFCU, Visa, and Wells

Fargo, including TYLER GREEN's and GERMANY's NFCU debit cards. Each of the transactions were performed at Platinum Jewelry.

       c.   Two Wells Fargo debit cards issued to RICHARD GREEN were among the eleven fraudulently used at Platinum Jewelry. Comerica identified at least 46 separate transactions involving the two debit cards, totaling approximately $6,678,587.13, all of which followed the same pattern as the transactions conducted by TYLER GREEN and GERMANY.

       d.   In total, Comerica identified approximately $18,072,894 in fraudulent transactions at Platinum Jewelry involving the 11 cards between March 12 and May 18, 2021. The financial institutions who issued the cards later charged the merchant processor, Worldplay, for the full amount of the loss.

      **E.**   **Platinum Jewelry Logs Customer Information for Every Sale**

    19.  On July 7, 2021, a private investigator hired by Platinum Jewelry informed FBI Special Agent David Garcia that all of Platinum Jewelry's sales are logged and inventoried based on a customer's profile, which is created when the customer conducts their first transaction at the business. These profiles include identifying information such as the customer's name, address, and phone number.

    20.  The private investigator also informed Special Agent Garcia that RICHARD GREEN, TYLER GREEN, and GERMANY had been customers of Platinum Jewelry since at least 2018 and had conducted small transactions at the store through the years.

### F.   TYLER GREEN Fraudulently Purchased a $219,000 Ring

21.   Platinum Jewelry sales records indicate that on April 19, 2021, at approximately 0509PM, TYLER GREEN purchased a ring (listed as "LDS RG DIAS 10.10CTW 18KYG 13.0" with an inventory number of PLA040981) for $219,000 using one of the Wells Fargo debit cards in RICHARD GREEN's name.  The invoice associated with the purchase lists TYLER GREEN as the customer and SUBJECT PREMISES 1 as her address.

22.   Records for the Platinum Comerica account show that RICHARD GREEN's Wells Fargo debit card that was used by TYLER GREEN was used for eight separate transactions at Platinum Jewelry on April 19, 2021, each of which was initially declined then immediately force-posted, including the purchase of the ring, totaling $1,225,644.41.

23.   Call records for the TYLER GREEN phone indicate that on April 19, 2021, TYLER GREEN called Platinum Jewelry employees at 9:51 a.m., 9:53 a.m., and 10:20 a.m.  According to the invoice and receipt associated with the purchase of the ring, one of the employees TYLER GREEN called was the cashier who processed the transaction.  Call records for GERMANY's phone show that GERMANY called Platinum Jewelry's main line that morning around 8:43 a.m.

24.   Platinum Jewelry business records indicate that TYLER GREEN brought the ring back to Platinum Jewelry for maintenance shortly after the fraudulent purchase.

25.   On June 14, 2021, Special Agent Garcia performed surveillance in the vicinity of Platinum Jewelry and saw TYLER

GREEN and GERMANY return to Platinum Jewelry to pick up the
jewelry that was previously returned for maintenance.  Special
Agent Garcia recognized TYLER GREEN and GERMANY based on his
review of their respective California Department of Motor
Vehicles ("DMV") photos.  Platinum Jeweler's legal counsel told
agents that the store manager told TYLER GREEN and GERMANY that
the jewelry was not yet ready for pick up and that they would
have to come back at a later date.

26.  I reviewed surveillance video from Platinum Jewelry
for June 14, 2021, and saw TYLER GREEN and GERMANY entering the
store and interacting with Platinum Jewelry employees.  I
recognized TYLER GREEN and GERMANY from my review of their
respective California DMV photos and my investigation in this
case.  TYLER GREEN and GERMANY appear to approach and hug
Platinum Jewelry's security guard then exit the store few
minutes later without any merchandise.

**G.   RICHARD GREEN Fraudulently Purchased a $42,000
       Bracelet**

27.  Platinum Jewelry sales records indicate that on April
27, 2021, at approximately 0246PM, RICHARD GREEN purchased a
bracelet (listed as "BRACELET DIAS 10.67CTW WG8.6" with an
inventory number of PLA041683) for $42,550 using a Wells Fargo
debit card in his name.  The invoice associated with the
purchase lists RICHARD GREEN as the customer and SUBJECT
PREMISES 1 as his address.

28.  The Platinum Comerica account records show that
RICHARD GREEN used that debit card for seven separate

transactions at Platinum Jewelry on April 27, 2021, each of which was initially declined then immediately force-posted, including the purchase of the bracelet, totaling $979,479.

29.  Platinum Jewelry business records indicating that RICHARD GREEN brought the bracelet back to Platinum Jewelry for maintenance shortly after the fraudulent purchase.  Based on the representations of Platinum Jewelry's legal counsel, I am aware that TYLER GREEN and GERMANY attempted to retrieve the bracelet on June 14, 2021.

### H.    GERMANY Fraudulently Purchased Chains and Bracelets

30.  Platinum Jewelry sales records indicate that on March 30, 2021, at approximately 2:59 p.m., GERMANY purchased a Cuban bracelet (listed as "CUBAN BRACELET 10KYG 11.9DWT" with an inventory number of PLA038410), two Rolex bracelets (listed as "ROLEX BRACELET 10KYG 11DWT" with an inventory number of PLA039315 and "ROLEX BRACELET 10KYG 12.3DWT" with an inventory number PLA039240), and four Rolex chains (listed as "ROLEX CHAIN 10KYG 39.7 DWT" with an inventory number PLA034113, "ROLEX CHAIN 10KYG 39.7 DWT" with an inventory number PLA034115, "ROLEX CHAIN 10KYG 13.6 DWT" with an inventory number PLA039217, and "ROLEX CHAIN 10KYG 22.4 DWT" with an inventory number PLA039236) for $14,475 using a Wells Fargo debit card in his name.  The invoice associated with the purchase lists GERMANY as the customer and an address in Rancho Cucamonga, California.

31.  The Platinum Comerica account records show that GERMANY attempted eight separate transactions at Platinum Jewelry on March 30, 2021.  Each of the transactions were

initially declined, however, one of the transactions was later force-posted, namely, the transaction for the $14,475 purchase.

**I.   RICHARD GREEN and GERMANY Wear Significant Amounts of Jewelry and RICHARD GREEN Possesses Firearms**

32.   On June 19, 2021, I reviewed the Instagram profile page for Instagram username "swavydog_".  I recognized RICHARD GREEN in many of the photos posted to the account from my review of RICHARD GREEN's DMV and booking photos.[3]  Of particular note, the account contains several pictures of RICHARD GREEN exhibiting what appears to be large amounts of cash (e.g., thousands of dollars in $100 notes) while wearing multiple golden chains around his neck.  For example, a photo posted to the account on or about May 2, 2021, shows RICHARD GREEN at a park looking down on five stacks of $100 notes and wearing multiple golden chains around his neck.  Similarly, a photo posted to the account on or about June 16, 2021, shows RICHARD GREEN fanning approximately thirty-seven $100 notes in front of his face and wearing multiple golden chains around his neck while sitting on the hood of a black Rolls Royce.  Based on my investigation, and the timing of the Instagram photos, I suspect that RICHARD GREEN likely fraudulently obtained the jewelry displayed in the photos from Platinum Jewelry.

33.   In addition, some of these photos -- at least three -- and a video show RICHARD GREEN with a semiautomatic pistol

---

[3] RICHARD GREEN was convicted on or about March 30, 2021, for a violation of California Penal Code Section 25850(A) (Carrying a Loaded Firearm in Public).  He is currently on probation and supervised by the Los Angeles County Probation Department.

either in his hand, in the background of the photo, or tucked in
his waistband.  The following is one such photo:



Based on my review of these photos, I believe that RICHARD GREEN
possesses firearms.

34.  During a period of surveillance on July 9, 2021, I
followed RICHARD GREEN from SUBJECT PREMISES 1 to a Verizon
Wireless store.  I saw RICHARD GREEN inside the store speaking
with a sales associate.  He was wearing at least six heavy
necklaces around his neck.  I captured the following photo of
RICHARD GREEN inside of the store:



35.   I later spoke with the sales associate who engaged with RICHARD GREEN.  The associate told me that RICHARD GREEN paid his phone bill while at the store and displayed a large stack of $100 bills.

36.   During a period of surveillance on June 29, 2021, at around 4:00 p.m., I saw GERMANY sitting in the passenger seat of a car near an apartment community in Riverside, California.  I was able to see clearly into the car and recognized GERMANY from my review of his DMV and booking photos.[4]  GERMANY appeared to be wearing multiple golden necklaces at the time.

**J.    TYLER GREEN, RICHARD GREEN, and GERMANY Pawn Fraudulently-Purchased Jewelry for Cash**

37.   Platinum Jewelry loan records show that during the time of the fraudulent transactions TYLER GREEN, RICHARD GREEN, and GERMANY received multiple cash loans against jewelry placed in hock at Platinum Jewelry.  For example, between March 7 and May 16, 2021, GERMANY received $169,940 in cash in exchange for the pawning of 17 items of jewelry.  Between April 15 and May 13, 2021, RICHARD GREEN received $388,500 in cash in exchange for the pawning of 21 items of jewelry.  And between March 3 and April 30, 2021, TYLER GREEN received $399,300 in cash in exchange for the pawning of 31 items of jewelry.  Based on my

---

[4] GERMANY was arrested by the Los Angeles County Sheriff's Department in Lancaster, California, on February 11, 2020, for a violation of California Penal Code Section 211 (Robbery - Second Degree).  Based on my review of his criminal history, there is presently a warrant issued for GERMANY's arrest related to that incident.  Additionally, GERMANY was convicted on June 05, 2018, for a felony violation of Nevada Revised Statute Section 205.222.2 (Grand Larceny) and there is presently a warrant for his arrested issued by the Nevada Department of Public Safety Parole and Probation related to that conviction.

review of Platinum Jewelry records, at least one of the items
pawned for cash had been fraudulently purchased as part of the
scheme described herein.

###    K.    TYLER GREEN and RICHARD GREEN Use SUBJECT PREMISES 1 as a Primary Address

38.   All of the PLATINUM JEWELRY invoices related to TYLER
GREEN and RICHARD GREEN list SUBJECT PREMISES 1 as the address
of record for TYLER GREEN and RICHARD GREEN.

39.   California DMV records for RICHARD GREEN list SUBJECT
PREMISES 1 as RICHARD GREEN's address of record since at least
May 17, 2021.

40.   On or about June 28, 2021, I received information from
the United States Postal Inspection Service and indicating that
both TYLER GREEN and RICHARD GREEN have received mail at SUBJECT
PREMISES 1 in 2021.

41.   On June 28, 2021, RICHARD GREEN's supervising
probation officer told me that RICHARD GREEN reported to
probation that his present address of record is SUBJECT PREMISES
1.

42.   As described above, on July 9, 2021, I saw RICHARD
GREEN wearing significant amounts of jewelry after leaving
SUBJECT PREMISES 1.

43.   On May 28, 2021, HSI Special Agent Masood Azaran
performed surveillance in the vicinity of SUBJECT PREMISES 1 and
saw a blue Mercedes sedan displaying a California license plate
parked in front of the residence.  California DMV records list
TYLER GREEN as the registered owner of the car.

44.  I reviewed bank statements from NFCU for TYLER GREEN and learned that SUBJECT PREMISES 1 is her address of record for the various bank accounts in her name that I have identified.

**L.    TYLER GREEN Resides at SUBJECT PREMISES 2**

45.  I reviewed an incident report from the Los Angeles County Sheriff's Department dated April 08, 2021, in which TYLER GREEN reported her residential address as SUBJECT PREMISES 2.

46.  On July 15, 2021, I spoke with a probation officer from the Los Angeles County Probation Department.[5]  She told me that TYLER GREEN's address of record with the Probation Department is 44000 East Sahuayo St., Lancaster, California 93535.  I queried that address in Google Maps and was unable to locate a residence associated with the address.  However, I did notice that the address is adjacent to SUBJECT PREMISES 2.

47.  On or about June 21, 2021, Special Agent Garcia spoke to a leasing manager for the apartment community in which SUBJECT PREMISES 2 is located and confirmed that TYLER GREEN presently resides at SUBJECT PREMISES 2 with her boyfriend and four daughters.  The leasing manager also informed Special Agent Garcia that TYLER GREEN is the only person on the lease.

**M.    GERMANY Resides at SUBJECT PREMISES 3**

48.  California DMV records for GERMANY list SUBJECT PREMISES 3 as GERMANY's address of record since at least May 19, 2021.

---

[5] TYLER GREEN was convicted on or about July 1, 2021, for a felony violation of California Penal Code Section 845(A)(4) (Assault with a Deadly Weapon with Force: Possible Great Bodily Injury).  She is currently on probation with the Los Angeles County Probation Department.

49.  During a period of surveillance on July 6, 2021, I saw the car in which I had previously seen GERMANY in the passenger seat (as described in paragraph 36 above) parked in front of SUBJECT PREMISES 3.

50.  Based on my review of cell-site information, I am aware that GERMANY's phone regularly returns to the vicinity of SUBJECT PREMISES 3 at night consistent with a residence of SUBJECT PREMISES 3.

**N.   RICHARD GREEN Resides at SUBJECT PREMISES 4**

51.  On June 29, 2021, the Honorable Rozella A. Oliver, United States Magistrate Judge, approved a warrant for the disclosure of prospective cell-site information and GPS information for various cellular telephones, including two phones use by RICHARD GREEN, as confirmed by RICHARD GREEN's supervising probation officer.

52.  Based on my review of information obtained pursuant to that warrant, I am aware that between July 2, the date I first received information pursuant to the warrant, and July 8, 2021, SUBJECT PREMISES 4 was regularly within the radii of uncertainty for both of RICHARD GREEN's phones.

53.  On July 9, 2021, in response to the cell-site information, agents performed surveillance in the vicinity of SUBJECT PREMISES 4.  During the period of surveillance, agents saw RICHARD GREEN drive out of the garage of SUBJECT PREMISES 4. RICHARD GREEN was driving a Dodge Charger "Hellcat Edition" that did not have a front or rear license plate affixed.  However, RICHARD GREEN's DMV record indicates that RICHARD GREEN owns a

2019 Dodge Charger, which the National Motor Vehicle Title
Information Service lists as a 2019 Dodge Charger "Hellcat
Edition" registered to RICHARD GREEN.

54.  I reviewed leasing documents related to SUBJECT
PREMISES 4.  M.M. is the sole name on the lease.  M.M.'s phone
number is also listed in the leasing documents.  I reviewed call
records for the TYLER GREEN phone.  Between March 8 and April
23, 2021, M.M. and TYLER GREEN exchanged at least 34 calls.

### V.   TRAINING AND EXPERIENCE REGARDING FRAUD OFFENSES

55.  Based on my training, experience, and consultation
with other law enforcement officers, I am aware of the
following:

a.   Individuals involved in fraud schemes like this
one usually keep evidence of their schemes, such as pay-owe
sheets for dividing the proceeds, contact information for their
co-conspirators, and records documenting the scheme so if an
error is made, they can recreate the documentation needed to
help conceal the fraud.

b.   These individuals often use the proceeds of the
fraud to purchase expensive items, or store the proceeds in the
form of cash to make it more difficult to trace.

c.   Individuals involved in fraud schemes need to
communicate with their co-schemers about their fraudulent
activity.  There are usually records of those communications in
their electronic devices such as cellular telephones.

d.   Typically, they maintain the evidence where it is
close at hand and safe, such as in their residences, vehicles,

and digital devices, which are also commonly stored in their residences and vehicles.  Such individuals commonly use digital devices to communicate with their fellow participants by phone, email and text messages.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation.

e.   I know from training and experience that individuals involved in fraud keep the most damaging evidence and/or proceeds of the scheme at their residences, vehicles, garages and to help conceal the fraud from their fellow coworkers who may have access to such documents at the workplace.  Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers.  More sophisticated or cagey criminals may rent public storage units to use to further distance themselves from incriminating evidence, or safety deposit boxes, especially when storing valuables such as cash.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

57. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

58.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

24

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TYLER GREEN's, RICHARD GREEN's, and GERMANY's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of TYLER GREEN's, RICHARD GREEN's, and GERMANY's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    59.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

//

## VII.  **CONCLUSION**

60.  For all the reasons described above, there is probable cause to believe that TYLER GREEN, RICHARD GREEN, and DAJAE GERMANY have committed violations of Title 18, United States Code, Section 1344(1) (Bank Fraud - Scheme to Defraud Bank).

61.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT PREMISES, as described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
July    , 2021.

_____
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE